Helms, Incorporated v. Commissioner.
Helms, Inc. v. Commissioner
Docket No. 17282.
United States Tax Court
1950 Tax Ct. Memo LEXIS 16; 9 T.C.M. (CCH) 1116; T.C.M. (RIA) 50302; December 12, 1950
*16 Ned A. Stewart, Esq., Melvin F. Johnson, Esq., and Max M. Morelock, Esq., for the petitioner. Donald P. Chehock, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in petitioner's income tax, declared value excess-profits and excess profits tax for the calendar years 1942 to 1945, inclusive, as follows: Declared
Income
Value Excess-
Excess
Year
Tax
Profits Tax
Profits Tax
1942
$ 54.69
$1,762.58
$ 9,706.67
1943
54.69
1,620.13
9,613.50
1944
455.07
2,536.65
13,918.25
1945
3,005.31
16,896.67
The three issues here presented are these: Did the respondent err in disallowing: (1) A part of the deduction claimed by petitioner for salary and compensation paid its president, A. K. Helms, during the years 1942 to 1945, inclusive; (2) a deduction as attorney fee expenses of $250 claimed by petitioner for 1944; and (3) a deduction of $1,000 paid by petitioner to the Fair Association in 1945? Other adjustments made by the respondent are not contested. Findings of Fact We adopt the stipulation of facts and from it and oral testimony find: The petitioner *17 was incorporated in January 1939, under Arkansas law, for the purpose of owning and operating three retail liquor stores in Texarkana, Arkansas, theretofore owned by a partnership composed of A. L. Helms, father, hereinafter called "A. L.", and A. K. Helms, son, hereinafter called "A. K.". Petitioner's returns for the taxable years were filed with the collector of internal revenue for the district of Arkansas. Petitioner's authorized capital stock was issued in exchange for the partnership assets as follows: A. K., 143 shares, A. L., 46 shares, and W. A. Helms, 1 share. The location of the three stores and the agreed value of the assets of each when taken over by petitioner were: No. 1, 108 State Line Avenue
$14,404.24
No. 2, 222 East Broad Street
2,431.25
No. 3, 401 East Seventh Street
2,164.51
On January 5, 1939, petitioner elected A. K. as its president and A. L. as vice president, and by formal action of its board of directors employed A. K. to manage and operate store No. 1 and A. L. to manage and operate stores Nos. 2 and 3, each of whom was to receive, and did receive, as compensation therefor 80 per cent of the annual net profit of the store or stores *18 so operated by him. On January 23, 1940, due to ill health, A. L. resigned as manager of store No. 2, and A. K. was employed to manage it as well as No. 1, on the same terms. A. K. continued to manage both stores No. 1 and No. 2 on the same percentage basis until December 30, 1944, when P. O. Bentley, an employee in store No. 2, was, upon formal action of the board of directors, promoted to the position of manager of said store No. 2, and his compensation therefor fixed at 80 per cent of the annual net profits of such store, and Bentley served as manager of No. 2 throughout all of the year 1945 and for his services was paid 80 per cent of the net profits of said store. Store No. 3 ceased to belong to petitioner on May 26, 1941, A. L. on that date having surrendered to petitioner his 46 shares of the company's stock in exchange for the assets of store No. 3. Simultaneously the 46 shares were reissued, 41 shares to A. K. in payment of individual advances made by him to the corporation, and one share each to five employees. From May 26, 1941, through December 31, 1945, A. K. owned not less than 184 of the 190 shares of petitioner's stock issued and outstanding. Petitioner's gross *19 sales, gross profits, net income before officers' salaries, and total officers' salaries from 1939 to 1945, inclusive, as shown by petitioner's books and returns filed by it, are as follows: Net Income
Before Officers'
Total Officers'
Year
Gross Sales
Gross Profit
Salaries
Salaries
1939
$138,393.93
$27,932.69
$12,036.23
$ 9,361.52
1940
126,351.95
26,504.75
8,485.64
6,559.71
1941
180,420.27
43,625.02
25,727.66
20,246.48
1942
396,076.36
79,917.64
44,684.98
33,876.53
1943
278,950.82
53,514.65
33,954.77
25,416.01
1944
375,151.33
66,254.34
47,629.16
36,696.57
1945
511,602.30
76,979.33
57,001.70
40,272.50
During the same period the officers of petitioner and the salary paid to each were as follows: R. H. Helms, Vice
Pres. to 1944,
A. K. Helms,
A. L. Helms,
Sec.-Treas.
R. D. Carter,
C. W. Dunn,
Year
President
Vice-Pres.
Thereafter
Sec.-Treas.
Vice-Pres.
1939
$ 6,098.50
$3,263.02
1940
4,605.47
1,954.24
1941
15,891.37
$ 977.92
$3,377.19
1942
23,948.64
3,769.48
6,158.41
1943
22,504.34
2,449.17 (2 mo.)
462.50
1944
31,950.74
2,825.83
$1,920.00
1945
35,392.50
2,720.00
2,160.00
*20 The total wages and salaries paid by petitioner to non-officer employees for the period 1939 to 1945, inclusive, were: 1939
$ 5,432.50
1940
6,043.84
1941
5,334.23
1942
15,217.98
1943
7,121.07
1944
7,330.10
1945
6,243.35
During this period dividends were paid only in 1941 and 1943, the aggregate sum paid in 1941 being $3,800, or $20 a share, and in 1943 an aggregate payment of $11,400, or $60 a share. An analysis of the separate operations of petitioner's No. 1 and No. 2, as shown by petitioner's books, is as follows: NUMBER ONE STORE
Net Profit
Before Mgr.'s
Compensation
Manager's
Net Profit
and Income
Com-
Before
Year
Sales
Gross Profit
Taxes
pensation
Income Taxes
1939
$ 93,471.07
$18,310.37
$ 7,842.12
$ 6,098.50
$ 1,743.62
1940
78,470.87
16,071.96
4,862.00
3,750.85
1,111.15
1941
132,107.55
31,160.25
16,075.12
12,126.80
3,948.32
1942
332,309.69
67,707.66
31,089.71
21,412.48
9,677.23
1943
216,580.08
41,983.25
25,421.34
18,428.92
6,992.42
1944
303,974.95
56,432.21
40,188.22
29,932.99
10,255.23
1945
433,118.17
69,494.28
50,535.65
35,392.50
15,143.15
NUMBER TWO STORE
1939
$ 24,283.89
$ 5,137.92
$ 1,663.49
* $ 1,281.58
$ 381.91
1940
22,822.33
5,021.54
1,122.46
854.62
267.84
1941
36,960.01
9,910.39
4,989.34
3,764.57
1,224.77
1942
63,766.67
12,209.98
3,667.38
2,536.16
1,131.22
1943
62,370.74
11,531.40
5,621.76
4,075.42
1,546.34
1944
71,176.38
9,823.13
2,695.11
2,017.75
677.36
1945
78,484.13
7,485.05
5,296.05
**3,710.00
1,586.05
*21 Manager's compensation above was paid to A. K. Helms, except: The City of Texarkana is partly in Arkansas and partly in Texas. State Line Avenue is the boundary line between the two states, store No. 1 being on the Arkansas side of the street, the Texas side not permitting the sale of liquor. A. K. was born in 1893 and has always lived in or near Texarkana. He quit school at 14 to work for his father (A. L.) then a merchant, and never attended school thereafter. From 1935 to 1939 he and A. L. were partners in the liquor business. The partnership liquor license was in A. L.'s name, since he lived in Arkansas, and the law required the licensee to be a resident of Arkansas. A. K. lived in Texas, then as now. In 1939 the business was converted from a partnership to a corporation, since A. L., due to age and ill health, was about to retire therefrom, and the license was issued in the name of petitioner. A. K. was the dominant figure in the organization and management of petitioner's business. During the taxable years, except for about 15 per cent of his time devoted to his farm on which he lived, 10 miles from store No. 1, *22 he devoted his entire time to petitioner's business. Besides management of the business his duties were those of buyer and seller and devising means to expand sales. Store hours were from 8 A.M. to midnight, except Sunday, [1] and A. K. was generally in the store, except when absent in the procurement of liquor. Intoxicating liquor was difficult to obtain during most of these years, and A. K.'s acquaintance and association with those engaged in the industry, his efforts applied thereto, and the large purchases of liquor made by him prior to 1939, on which allocations for purchase permits were based, enabled him to obtain for petitioner the maximum amount of liquor procurable by a retail dealer. He was well and favorably known by the liquor industry and was reputed as being the best operator of a retail liquor store in Arkansas. In 1939 Strauss & Co., an established wholesale liquor firm with which A. K. was not connected, offered A. K. a position as manager of a liquor house at an annual salary of $15,000 to $20,000, which he declined. His compensation from petitioner in 1939 was $6,098.50. Store No. 1, in 1944 and 1945, had the largest volume of business of any retail liquor store *23 in Texarkana, [2] and reputedly the largest in the state. Its location was excellent for petitioner's business. The war years, especially 1944 and 1945, were good for those engaged in the liquor business. Texarkana then had two large war plants, with thousands of employees, which augmented the buyers of liquor. Adjoining store No. 1, on the same street, a location equally as desirable as No. 1, was the Twin City liquor store, a competitor of petitioner, and during the taxable years its sales were about one-half of those of store No. 1. A. K.'s management and good will established by him was largely responsible for this difference in sales and profits. To create good will for petitioner, A. K. borrowed money from the bank, enabling petitioner to cash checks for war workers. A. K. made many trips to Little Rock and elsewhere in his efforts to procure liquor for the business, and this and other expenses and entertainment incurred by him in petitioner's behalf were paid by him, for none of which was he reimbursed *24 by petitioner. The 80 per cent of the net profits [3] of the stores operated by A. K. and paid to him by petitioner constituted the only compensation which he received for his entire services to petitioner. The success of petitioner's business in the taxable years was in a large measure due to the services rendered it by A. K. The compensation paid A. K. by petitioner in each of the taxable years was reasonable in amount. The Commissioner disallowed the salary deductions claimed by petitioner for services of A. K., its president, and determined the following as reasonable compensation for such services, viz: 1942, $10,000; 1943, $10,000; 1944, $12,000, and 1945, $14,000. In 1944 petitioner paid an attorney $250 for legal services in connection with the proposed organization of a separate corporation designed to make purchases of liquor outside the State of Arkansas, but the corporation was never formed. This expenditure was disallowed by the Commissioner on the ground that the proposed organization *25 of a separate business firm was not a part of petitioner's ordinary and necessary business expenses. This expenditure was not an ordinary and necessary business expense of petitioner. In 1945 petitioner made a contribution to the Four States Fair Association of $1,000, and claimed same as a deduction, which was disallowed by the Commissioner on the ground that it was not an organization within the definition of section 23 (q) (2) of the Code. The Four States Fair Association was, in the year 1945, a corporation organized and operated exclusively for scientific and educational purposes. No part of its net earnings inured to the benefit of any private shareholder or individual, and no part of its activities was devoted to the carrying on of propaganda or otherwise to influence legislation. Opinion Whether the sums paid petitioner's president, A. K. Helms, during the taxable years as compensation for his services were deductible depends upon whether or not such compensation was reasonable. Section 23 (a) (1) (A), I.R.C.
Respondent correctly states that it is well settled that the question of reasonable compensation is essentially one of fact to be determined *26 by the peculiar facts and circumstances in each case. Furthermore, in a closely held corporation such as this, where the petitioner's president at all times owned a controlling interest of the stock, the law contemplates reasonableness of salaries must be carefully scrutinized, and the burden of proving that it is entitled to a larger deduction than that determined by the Commissioner rests upon the taxpayer. This test we have applied and after careful scrutiny and consideration of all of the facts and circumstances disclosed by the evidence we have reached the conclusion that the petitioner has met the burden imposed upon it and has shown by the evidence that the compensation paid its president in each of the taxable years was reasonable in amount. Thirteen witnesses in behalf of petitioner testified to facts in support of its contention on this issue, while the respondent offered no witness. Three of these, shown to be qualified, testified that the compensation paid was reasonable and customary. This opinion evidence was strongly corroborated by many facts and circumstances detailed by the other witnesses, the substance and effect of which is contained in our findings of fact which *27 we deem it unnecessary to repeat. The formula for determining the compensation in question was adopted when petitioner was first organized, several years prior to the taxable years, and had been consistently followed. It was the same method and the same percentage used in determining the compensation of the manager of each of petitioner's three stores in all years, and significantly the same as used in 1945 in determining the salary of Bentley as manager of No. 2, who was not a stockholder, but merely an employee. It was shown that the liquor industry usually paid its managers upon a percentage basis. While compensation upon this basis sometimes produces substantial sums, it must be remembered that one who serves wholly upon a contingent basis takes a risk which one serving for a fixed salary does not. That A. K. Helms has character and business competency is attested by the testimony of the mayor, bankers and others of Texarkana, and also by the splendid record which petitioner made under his management. In 1939, when petitioner was first organized, A. K. Helms was offered a salary of $15,000 to $20,000 by an established wholesale house to manage a liquor establishment, which *28 he refused. Petitioner paid him in that year only about $6,000, but he had faith that he could build petitioner's business so that it would pay him substantial sums, which he succeeded in doing. Respondent contends that the increased volume of petitioner's business was due to the location of store No. 1, to war conditions and the two war plants in Texarkana. While these doubtless did contribute materially thereto, the management and services of A. K. Helms was also a major factor, as testified to by petitioner's next door competitor who gave his candid reason why petitioner's business doubled his own was due to A. K. Helms' management and good will. As to issue (1), the evidence amply sustains our finding that the compensation paid petitioner's president in each of the taxable years was reasonable, and hence deductible in full, and the Commissioner's disallowance of same in part is reversed. As to issue (2), we sustain the Commissioner's disallowance of the $250 attorney's fees, since same did not constitute ordinary and necessary business expense. As to issue (3), we think the $1,000 paid the Fair Association was deductible under section 23 (q) (2) of the Code, and Commissioner's *29 action in disallowing same is reversed. Decision will be entered under Rule 50. Footnotes
*. A. L. Helms in 1939. ↩
**. P. O. Bentley in 1945.↩
1. In November and December, 1942, and the first part of 1943, due to scarcity of liquor, the store hours were shortened. ↩
2. There were then 12 to 15 such stores in Texarkana.↩
3. The percentage method of determining compensation for executives, managers and employees in the liquor industry is often used, salesmen being paid 5 per cent of gross sales.↩